**Charles O. STARRETT, Jr., Petitioner,**

v.

**SPECIAL COUNSEL, Respondent.**

No. 85–1694.

United States Court of Appeals,
Fourth Circuit.

Argued March 3, 1986.

Decided June 5, 1986.

---

**2.** We express no opinion on the total fee award or the rights of counsel thereto *inter se.*

David H. Shapiro (Joseph B. Scott, Kator, Scott & Heller, Washington, D.C., on brief), for petitioner.

David Kane, Washington, D.C., Reviewer for Litigation, Merit Systems Protection Bd. (Evangeline W. Swift, General Counsel, Mary L. Jennings, Associate Gen. Counsel for Litigation, Deborah A. Stover-Springer, Washington, D.C., on brief), for respondent.

Before WINTER, Chief Judge, and MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

## I.

Charles O. Starrett ("Starrett") was the Director of the Defense Contract Audit Agency ("DCAA"). The Office of Special Counsel ("Special Counsel") of the Merit Systems Protection Board ("MSPB" or "Board") filed a complaint against Starrett under the Civil Service Reform Act of 1978 ("the Act") 5 U.S.C. § 1206(g)(1)[1] for his refusal to grant a waiver under the DCAA's rotation policy for George Spanton ("Spanton"), a DCAA resident auditor in West Palm Beach, Florida.

Under the Act, Special Counsel "shall receive any allegation of a prohibited personnel practice and shall investigate the allegation to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken." 5 U.S.C. § 1206(a)(1). "Prohibited personnel practice" is defined in 5 U.S.C. § 2302 and includes "a detail, transfer, or reassignment" which is inappropriate.[2] § 2302(a)(2)(A)(iv). The alleged protected activity which Starrett was said to violate was Spanton's exposure of accounting irregularities in government defense contracts. Section 2302(b)(8) of the Act specifically prohibits reprisals or adverse personnel action against employees who expose such irregularities.[3]

Part of Spanton's responsibility as DCAA resident auditor for West Palm Beach was auditing the Government Products Division of Pratt and Whitney Aircraft. Spanton had had a difference of opinion for some time with his supervisors in the Atlanta office of the DCAA because

---

1. 5 U.S.C. § 1206(g)(1) states, in pertinent part, that

    [I]f the Special Counsel determines that disciplinary action should be taken against any employee—
    (A) after any investigation under this section, or
    (B) on the basis of any knowing and willful refusal or failure by an employee to comply with an order of the Merit Systems Protection Board, the Special Counsel shall prepare a written complaint against the employee containing his determination, together with a statement of supporting facts, and present the complaint and statement to the employee and the Merit Systems Protection Board in accordance with Section 1207 of this title.

2. For example, detail, transfer or reassignment designed as reprisal constitutes "prohibited personnel practice." 5 U.S.C. § 2302(b)(8) and (9).

3. 5 U.S.C. § 2302(b)(8) states in pertinent part that:

    (b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—
    . . . .
    (8) take or fail to take a personnel action with respect to any employee or applicant for employment as a reprisal for—
    (A) a disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—
    (i) a violation of any law, rule, or regulation, or
    (ii) mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs . . .

he viewed his position as auditor as an independent one and he believed he should be free from interference from other DCAA officials. Joseph Nocera ("Nocera"), Chief of the Policy Liaison Division of DCAA, who investigated Spanton's charges against the DCAA, stated in February 1983 that Spanton "resent[ed] any regional or Headquarters direction or intrusion into the operation of his field office." The specific conduct which forms the basis of this case concerns Spanton's allegations that in the course of his auditing work he had uncovered irregularities in the government contracts of Pratt and Whitney and that the DCAA had failed adequately to investigate the irregularities.

Starrett's response to those allegations formed the basis of the action by the Special Counsel against him which is before us, but in order to understand the nature of the prohibited personnel practice which Starrett is alleged to have engaged in, it is necessary to delve into the intricacies of DCAA policies.

Under a DCAA policy established in 1967, resident auditors were to be regularly rotated to different companies or regions in order to ensure their continued objectivity and independence. Under that policy, each resident auditor was to be relocated to a new assignment after a maximum of five years in his old position. According to the DCAA's policy statement, such rotation could "involve a change in duty station within the commuting area or a relocation to a different commuting area."

Spanton was due for reassignment to a new duty station no later than March 1983. Under DCAA policy, such rotation could occur earlier but it had to occur before the resident auditor had completed five years work in one duty station. The Director of the DCAA could grant waivers to the mandatory rotation policy on a case-by-case basis for, among other reasons, an auditor's announced retirement, adverse medical con-

sequences, or extreme financial or personal hardship to the auditor concerned. In April 1982 Spanton requested such a waiver of his March 1983 rotation date. Spanton stated that he wished to remain in Florida until December 1983, the date when he intended to retire. Instead of granting a waiver, the Atlanta regional director of the DCAA advanced Spanton's rotation date to September 1982. Spanton then filed a complaint with the Special Counsel alleging that he was being prematurely reassigned to a new duty station in reprisal for having filed an Equal Employment Opportunity complaint against the Atlanta Regional director and for having testified on behalf of a subordinate in a MSPB hearing in July 1981, where he expressed opposition to the DCAA rotation policy.[4] The September 1982 rotation date was rescinded by the DCAA, but Spanton was still due for mandatory rotation by March 1983.

Previously, on February 11, 1982, Spanton had produced a DCAA report critical of Pratt & Whitney's entertainment costs. Instead of submitting the report to his superiors through usual DCAA channels, some time in July 1982 Spanton gave it directly to the Defense Criminal Investigation Service ("DCIS") in conjunction with a charge which was being investigated at that time by the DCIS. In that matter, Spanton had been charged with showing favoritism to Pratt & Whitney. The February 1982 Pratt & Whitney entertainment costs report constitutes the first protected act of whistleblowing under 5 U.S.C. § 2302(b)(8) engaged in by Spanton and is one basis for the complaint against Starrett under the Act which forms the basis of this appeal.

Beginning in August 1981, Spanton also worked on an audit of Pratt & Whitney's proposed forward pricing labor rates for its government contracts—a projection of future labor rates made by the company. In the course of his investigation Spanton came to the conclusion that Pratt & Whit-

---

4. The complaint resulted in Special Counsel's initiating on Spanton's behalf a § 1206(g) disciplinary action against the Atlanta regional director. In *Special Counsel v. Brown*, 28 M.S.

P.R. 133 (M.S.P.B., 1985), the Board held that Special Counsel had not conclusively established a *prima facie* case of violation of the Act. The matter is not presently before us.

ney's projected rates included more than $150 million in excess labor costs. Spanton discussed his findings with and submitted a report ("the labor rate report") dated March 13, 1982 to his DCAA superiors, but, concerned that they were not promptly investigating his findings, Spanton released information about the report on or about August 1, 1982 to channels outside the DCAA. Information about Spanton's allegations about the irregularities in Pratt & Whitney's costs began to appear in the news media. By the beginning of September 1982 the DCAA was well aware of the reports. Spanton's allegations were the basis of a series of articles in *The Washington Times* about Spanton, Pratt & Whitney and the DCAA.

The DCAA decided to institute a special investigation about Spanton's allegations concerning the Pratt & Whitney entertainment costs and labor rate reports. On October 19, 1982, Starrett wrote the Atlanta Regional Director asking for information about Spanton's reports and charges, including Spanton's charge that the DCAA had not properly audited Pratt & Whitney and other defense contractors. The Atlanta officials in turn on October 25, 1982 requested information from Spanton to support his charges. The information provided by Spanton on November 8, 1982, in the view of Starrett and the Atlanta Regional Director, was unsatisfactory. They believed that the information Spanton provided them to justify his reports about Pratt & Whitney was erroneous and inconclusive. As a result, in December 1982 Starrett asked Nocera, a Deputy Assistant Director at DCAA and a senior auditor with many years experience, to investigate Spanton's allegations. Starrett specifically asked Nocera to investigate Spanton's allegations about DCAA's failure to investigate abuses by Pratt & Whitney which were being publicized in the *Washington Times*. Nocera was asked to investigate the charges put forth in newspaper articles

that Spanton had given "concrete evidence of serious recent compromises made in the auditing of major producers of military hardware" and that Spanton had provided "the most specific evidence of the compromises of the entire DCAA audit system."

At the same time as Nocera's investigation of Spanton was progressing, the question of Spanton's rotation to a new duty post was being investigated by the Special Counsel in conjunction with Spanton's charges against the Atlanta Regional Director. On January 13, 1983 Special Counsel investigators interviewed Starrett in conjunction with the charges. On January 25, 1983, Starrett signed a statement, subject to the penalty specified in 18 U.S.C. § 1001, which described the conversation he had with Special Counsel. Starrett stated that he had told the investigators that he had requested Nocera, "the most independent, objective person I could find ... to go through what Spanton has said and see if there is any validity or basis for his comments in the [news]papers." Starrett further stated:

> Nocera's investigation has nothing to do with Spanton's complaint or grievance; it only focuses on Spanton's comments that have appeared in the news media. Nocera's investigation will refer, in part, to the report [5] Spanton issued because some of what was in the report has appeared in the articles.
>
> The idea behind the investigation is to determine primarily whether there are any problems within the agency.... If the investigation concludes that Spanton's allegations as reported in the articles have substance, it would affect my decision on his request for extension. I would be inclined to leave him there until he retires in December 1983. You must understand, however, that neither I nor the agency can force Spanton or anyone else to retire. Assuming that Spanton's allegations have substance, I would then

---

5. Starrett does not specify what report he means. The Special Counsel states that the reference is to the Labor Rate report. It is also possible that Starrett was referring to Spanton's

report about the mismanagement in the Atlanta office. Given our disposition of the case, the resolution of the factual matter is not of importance.

"work on" the region, but not necessarily in the way of personnel actions.

Nocera submitted his report to Starrett about Spanton's allegations in February, 1983. Nocera concluded "that all of the allegations made by Mr. Spanton in the press and otherwise stem from his current effort to avoid rotation from the Pratt and Whitney ... office." Nocera also concluded that Spanton's "allegations of widespread deficiencies in the operations of DCAA [were made] from a very narrow base, almost entirely without documents or factual support for the allegations. Mr. Spanton has allowed his comments to the press to be exaggerated and quoted out of context, while making no apparent attempt to correct or stop them, and now disavows any responsibility for the statements."

Nocera further noted that Spanton's charges against the DCAA were based on "outdated and unsupported access-to-records problems with which he has no first-hand knowledge." Nocera concluded that Spanton's charge that his early rotation was retaliation for his labor rates report was "in my opinion, unfounded and unsupported." Nocera believed that Spanton's transfer would be in the best interests of the Atlanta DCAA Regional Office because of "the continued antagonism between Mr. Spanton and the Region," and recommended that Spanton's request for a waiver of his March 1983 rotation date be denied.

On March 10, 1983, Starrett denied Spanton's request for a waiver of his mandatory transfer date and ordered Spanton to report within 60 days to another duty station. Starrett offered Spanton a choice among three possible regional assignments. In his letter to Spanton informing him of his denial of the waiver, Starrett outlined the circumstances which had led to his decision. Starrett noted that the transfer policy "was designed to help assure that lengthy contacts with the same contractor are not per-

ceived as interfering with the conduct of independent and objective audits. Although an announced intention to retire within one year may be grounds for granting a waiver from the policy, I have noted that despite your stated intentions to retire on two previous occasions, you have subsequently elected not to do so. I therefore can find no basis on which to deviate from a policy which has served the DCAA so well over the years."

Starrett next "consider[ed] the probable effects on Agency effectiveness" of Spanton's staying in his present position, given Spanton's specific circumstances. The first such circumstance was Spanton's refusal to submit a "report on labor rates" to the Atlanta office, a report which on "subsequent review" by the General Accounting Office, "revealed ... significant errors." Starrett noted that "the poor quality of the report adversely reflects on the professional reputation of this Agency and the publicity provided this report has aggravated the situation."

The second circumstance cited by Starrett as influencing his decision not to grant the waiver was his "review of allegations attributed to [Spanton] in the press and which [Spanton] did not deny making. The review concluded that either your allegations represented problems that were years old and corrected long ago, or were reiterations of conversations with other auditors that you apparently have taken out of context." [6] In conclusion, Starrett stated that "for all the foregoing reasons" he had decided not to grant Spanton a waiver and ordered Spanton to report to a new duty station outside the Atlanta DCAA region.

On August 31, 1983 Special Counsel filed a complaint for disciplinary action under the Act against Starrett and other persons.[7] The complaint alleged that Starrett had violated 5 U.S.C. § 2302(b)(8), *i.e.*, that Starrett had committed a "prohibited personnel practice" by denying Spanton's re-

---

6. Starrett also found that Spanton had made an unsubstantiated allegation that the Atlanta Regional office was harassing him and he also noted that one defense contractor had told the DCAA that it intended not to give Spanton further data in conjunction with his audits.

7. Only Starrett's case is before us.

quest for a waiver of his rotational assignment.

The MSPB assigned the case to an Administrative Law Judge on September 2, 1983 pursuant to 5 U.S.C. § 557.[8] The Board requested that the ALJ make a recommended decision to the agency pursuant to the procedures specified in 5 U.S.C. §§ 556 and 557. Pursuant to the Board's request, the ALJ held a thirteen day hearing. On July 25, 1984 the ALJ issued his recommended decision which exonerated all charged, including Starrett, under the Special Counsel's August 31, 1983 complaint. In an exhaustive opinion, the ALJ examined the facts relating to Spanton's request for a waiver of DCAA rotation policy and found that, although Spanton had made protected disclosures under the Act, the facts did "not establish a retaliatory motive on Starrett's part by their greater weight or more convincing nature."

The MSPB reversed the ALJ's decision in regard to Starrett on June 13, 1985. In its opinion [9] the Board stated:

> We have reviewed the record and concur in the subordinate factual findings made by the Administrative Law Judge. However, our review reveals that, in the key areas, the Recommended Decision is based upon incorrect conclusions drawn from the facts and/or upon incorrect interpretations of law.

28 M.S.P.R. at 65. The Board found that Starrett's denial of Spanton's waiver constituted retaliation against Spanton for protected disclosures under the act. On June 13, 1985 the Board ordered him removed from federal service and imposed a civil penalty of $1,000.00. 28 M.S.P.R. at 75. Starrett, pursuant to 5 U.S.C. § 1207(c), appeals from the Board's decision.

## II.

Starrett advances five arguments on appeal: (A) that the MSPB was bound by the ALJ's ruling; (B) that Starrett was denied advance notice of the specific reasons for the adverse action taken by the MSPB against him; (C) that the Board incorrectly found that Starrett had committed a prohibited personnel action in violation of 5 U.S.C. § 2302(b)(8); (D) that the MSPB was prohibited from both fining Starrett and removing him from government service; and (E) that the penalties imposed by the MSPB were harsh and disproportionate in comparison to the nature of the offense.

At the outset, Special Counsel argues that three of Starrett's points on appeal—those herein labeled "A," "D" and "E"—are barred because they have been raised for the first time on appeal. We disagree.

In his "motion for rehearing and reconsideration" of the MSPB's June 13, 1985 order, Starrett argued that the MSPB's penalty was disproportionate in relation to his offense and that the "Board ... exceeded its statutory authority by imposing dual penalties." In addressing this motion, the Board ruled on the arguments made and denied relief to Starrett. The remaining argument, *i.e.*, that the Board was bound by the ALJ's decision, is encompassed within the rule of *Leedom v. Kyne*, 358 U.S. 184, 192, 79 S.Ct. 180, 185–86, 3 L.Ed.2d 210 (1958) and *Sinai Hospital of Baltimore, Inc. v. Horvitz*, 621 F.2d 1267, 1269 (4th Cir.1980) which hold that one exception to the principle of exhaustion of remedies, analogous to the rule that arguments cannot be raised for the first time on appeal, is the situation where actions taken by an agency or board are "contrary to the enabling statutory authority itself." *Sinai Hospital*, 621 F.2d at 1269. An argument that the Board exceeded its authority by not accepting the ALJ's decision clearly falls within that exception and is not barred for consideration on appeal.

---

**8.** 5 U.S.C. § 557, part of the Administrative Procedure Act ("APA"), applies only when 5 U.S.C. § 556 specifies a hearing is required. 5 U.S.C. § 557(b) states, in pertinent part, that "[w]hen the agency makes the decision without having presided at the reception of the evidence, the presiding employee or an employee qualified to preside at hearings pursuant to section 556 of this title shall first recommend a decision."

**9.** *See Special Counsel v. Starrett,* 28 M.S.P.R. 60 (M.S.P.B., 1985).

### A. *The MSPB's Reversal of the ALJ's Ruling*

■ Starrett first argues that the MSPB was bound by the ALJ ruling and improperly overturned it, substituting a finding that Starrett had violated the Act by not allowing Spanton's rotation. Under administrative law principles, an agency or board is free either to adopt or reject an ALJ's findings and conclusions of law. Under the APA, "[o]n appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule." 5 U.S.C. § 557(b). The agency or board retains the power to rule on disputed facts and the ALJ's determinations of such facts are not given the weight of the findings of fact by a district court. As the reviewing court, we review the decision of the MSPB, not that of the ALJ. *See* 3 K. Davis Administrative Law Treatise, § 17.16 (2d ed. 1980).

Starrett argues that § 554(a) of the APA is applicable. It excepts certain actions from the scope of the procedures specified by the APA. 5 U.S.C. § 554(a) states,

(a) This section applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved—

. . . .

(2) the selection or tenure of an employee . . .

Citing *Deviny v. Campbell,* 194 F.2d 876 (D.C.Cir.1952), *cert. denied,* 344 U.S. 826, 73 S.Ct. 27, 97 L.Ed. 643 (1952) and *King v. Hampton,* 327 F.Supp. 714 (E.D.Mo.1971), *aff'd,* 451 F.2d 247 (8th Cir.1971), Starrett claims that the exclusion of § 554(a)(2) for "selection or tenure of an employee" ap-

plies to the case where a federal employee is subject to a disciplinary hearing.

■ To be sure, APA procedures ordinarily are not applicable in the case of employee disciplinary hearings, which involve "matter[s] of supervisory direction" which are "not ... subject to judicial review." *King v. Hampton, supra,* 327 F.Supp. at 716. However, where Congress has set up, as here, a special scheme involving the review by the MSPB of allegations of retaliation by supervisory officials for the protected actions of Civil Service Personnel and that scheme is explicitly made subject to the APA by 5 U.S.C. § 1207 and 5 U.S.C. § 3105, the normal exclusion of disciplinary matters from the procedures mandated by 5 U.S.C. §§ 556 and 557 does not apply. Under the Act, the Special Counsel investigates such charges and prosecutes them before the MSPB. Such actions are clearly within the ambit of the APA and the Board was clearly within its power when it rejected the ALJ's decision and substituted its own. Nevertheless, while the MSPB was not bound to accept, but could revise the ALJ's determinations, its own decision is subject to limited review by us.[10]

### B. *Notice of the MSPB's Action*

■ Starrett next claims that he was denied advance written notice as required by the Act, since the Board relied on statements made by Starrett to Special Counsel in connection with the investigation of Spanton's allegations concerning the advance of his rotation date which did not specifically refer to either of the two instances of Spanton's protected conduct— the entertainment costs or labor rate reports. Because the Special Counsel's present action against Starrett is based on those reports, Starrett argues that such

---

**10.** 5 U.S.C. § 7703(c) sets forth a standard of review which states that a court of appeal shall review the record and hold unlawful and set aside any agency action, findings, or conclusions found to be—

  (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

  (2) obtained without procedures required by law, rule, or regulation having been followed; or

  (3) unsupported by substantial evidence. . . .

unspecific references [11] mean that Starrett was not informed of the charges against him. The argument is without substance. The context of Starrett's statements clearly shows that he was referring to the reports which constituted Spanton's protected activities under the Act.

### C. Starrett's Violation of 5 U.S.C. § 2302(b)(8)

Starrett next argues that the Board used an inadequate or faulty standard of causation in determining whether he violated 5 U.S.C. § 2302(b)(8) and, alternatively, that even by the standard here employed by the Board, which required only that Starrett's reprisal for whistleblowing be a "significant factor" in his decision to take an adverse personnel action, the Board incorrectly found that Starrett had violated the Act. Because we reverse the Board's decision on the ground that Starrett's actions do not satisfy the Board's own standard of causation we do not reach petitioner's argument that the Board should have used a different standard of causation.[12]

The standard of causation advanced by Special Counsel is the same one used in *Special Counsel v. Brown, supra,* and *Special Counsel v. Harvey,* 28 M.S.P.R. 595 (M.S.P.B., 1984). *Brown,* a companion case to the one here under consideration, involved prosecution by the Special Counsel of a former Deputy Director of the DCAA for advancing Spanton's rotation date allegedly in retaliation against Spanton for filing an age discrimination complaint against a supervisor and for testifying against the DCAA in a MSPB proceeding. In *Brown,* the Board rejected the rather weak causation standard advanced by Special Counsel, *i.e.,* that disciplinary action against a manager was "warranted if re-

---

**11.** *See* note 5, above.

**12.** We note in passing that we simply refrain from assessing the merits of Starrett's argument that the Board should use a standard of causation similar to that advanced in the context of reprisals for constitutionally protected activity, such as that used in *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), or in Title VII retaliation cases. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981), and *Ross v. Communications Satellite Corp.,* 759 F.2d 355 (4th Cir.1985). While deference is normally given by the courts to a "consistent and long-standing interpretation by the agency charged with administration of the Act," *United States v. National Assn. Securities Dealers,* 422 U.S. 694, 719, 95 S.Ct. 2427, 2442–43, 45 L.Ed.2d 486 (1975), the "significant factor" test used by the MSPB here is neither "consistent" nor "long-standing."

To be sure, the Board has applied the significant factor test in two recent cases, *Special Counsel v. Harvey,* 28 M.S.P.R. 595 (M.S.P.B., 1984) and the companion case to this one, *Special Counsel v. Brown, supra.* Such limited and recent application of the "significant factor" standard might not be entitled to the usual deference given an agency's choice of a standard for causation, particularly in light of the Board's own use of a stricter "motivating factor" test in *Special Counsel v. Department of State,* 9 MSPB 14, 20, 9 M.S.P.R. 363, 371 (1982), *Gerlach v.* *F.T.C.,* 8 MSPB 599, 9 M.S.P.R. 268 (1981), and *Spaduro v. Department of the Interior,* 18 M.S.P.R. 462, 464–65 (M.S.P.B., 1983). Special Counsel posits a distinction between the latter three cases, "where the issue is whether the agency's action against an employee may be sustained or must be corrected" and "a disciplinary case under Section 1207 [where the issue] is whether a respondent should escape discipline for a prohibited personnel practice even if there is a lawful reason for taking the personnel action." *Special Counsel v. Harvey, supra,* 28 M.S.P.R. 595, 609. We observe that such a difference, valid as it may be in some contexts, may not support the use of a standard of causation which inadequately protects personnel, like Starrett, who are forced to make scores of personnel decisions which may peripherally or incidentally involve situations where employees have engaged in protected practice. The Act was designed to prohibit retaliation or reprisals by personnel because of improper consideration of protected actions. The standard of proof used must insure that the motivation for the adverse action was an improper one. There is no support in the legislative history of the Act for any particular standard of causation, but the standard used by the Board for any action under the Act, whether a "corrective action" under 5 U.S.C. § 1206(c)(1)(B) or a "disciplinary action" under 5 U.S.C. § 1206(g), must not be so loose or weak as to punish those not motivated by improper purposes.

The impact, if any, of such considerations in cases involving the propriety, *vel non,* of a standard of causation employed by the MSPB must await another day.

prisal played 'any part' in the challenged decision." The Board rejected such a standard because it would result in discipline of managers in cases where "reprisal played only a *de minimis* role in an otherwise legitimate personnel decision." The Board held that "[t]he better test" was "whether the protected conduct was a 'significant factor' in the decision." *Brown,* 28 M.S. P.R. at 137. In *Brown,* the charges that the agency official had engaged in adverse personnel action were dismissed and it was determined that the significant factor standard had not been met. *Brown* was not, therefore, a case where the requirements of that test were put to direct examination so as to determine the meaning of what affirmatively constitutes a "significant factor."

In the present case, the Board found that the facts relating to Starrett's denial of Spanton's waiver met its "significant factor" test because Starrett had considered the content of Spanton's allegations in making his decision not to grant a waiver to Spanton's otherwise mandated rotation. 28 M.S.P.R. at 66. The Board found "admissions" by Starrett and three pieces of "direct proof" for Starrett's reprisal of Spanton's whistleblowing: (1) Starrett's March 10, 1983 letter to Spanton denying his request for a waiver to the DCAA mandatory rotation policy; (2) Starrett's January 25, 1983 sworn statement given to two representatives of the Office of Special Counsel; and (3) Starrett's January 17, 1984 testimony before the ALJ.

The first piece of evidence, Starrett's March 10, 1983 letter to Spanton, contained the statement by Starrett to Spanton that he had "initiated a review of allegations attributed to you [Spanton] in the press" and that "[t]he review concluded that either your allegations represented problems that were years old and corrected long ago, or were reiterations of conversations with other auditors that you apparently have taken out of context." In the March 10, 1983 letter, Starrett also stated that he considered Spanton's allegations in the context of "the probable effects on Agency effectiveness of your continuance in your

present assignment" and concluded "for all of the foregoing reasons ... that a waiver of the mandatory rotation policy is not in the best interest of the [DCAA]."

The second "admission" by Starrett that he had considered the content of Spanton's whistleblowing was his January 13, 1983 sworn statement which reported the content of his meeting with representatives from the Office of Special Counsel. In the statement Starrett wrote:

> The idea behind the investigation [of Spanton] is to determine primarily whether there are any problems within the agency.... If the investigation concludes that Spanton's allegations as reported in the articles have substance, it would affect my decision on his request for extension. I would be inclined to leave him there until he retires in December 1983.

The third piece of "solid evidence" supporting Starrett's alleged retaliatory objective is Starrett's testimony before the ALJ on January 17, 1984. Starrett stated at that time that a factor in his decision whether or not to grant Spanton a waiver would be whether "Spanton ... was correct [in his allegations about Pratt & Whitney]. My primary thought ... was to get whatever it is fixed if we do have a problem." If Spanton's disclosures were accurate, Starrett stated that "[he] would consider that on the side of the equation for making the decision to leave [Spanton] in place." Starrett also indicated that because of "the problems between Mr. Spanton and the Region I would have moved Mr. Spanton anyways."

■ There is no doubt that this evidence shows that Starrett considered the substance of Spanton's allegations in making his decision whether to grant a waiver for Spanton's mandatory transfer. But a reasonable interpretation of his statements is that Starrett was concerned about the implications for the DCAA of Spanton's allegations and wanted to investigate the substance of those charges in order to see whether Spanton's allegations were true to

determine whether to act on those problems. Starrett stated that he would not remove Spanton if Spanton had been making accurate statements about irregularities in Pratt & Whitney and DCAA investigations. Starrett did not admit and the statements relied on by the MSPB cannot fairly be read to constitute admissions that he was retaliating against Spanton because of his whistleblowing. Rather the reasonable and fair reading of his statements was not more than that if what Spanton said were true, he would leave him in place because it indicated that there were problems which needed further attention by the DCAA. It appears to us indisputable that Starrett was fulfilling his imperative duty as the head of the DCAA to investigate alleged abuses in the auditing procedures of a defense contractor and possible failures by DCAA to investigate such abuses. Starrett could hardly have ignored Spanton's allegations. Instead, he stated that he would consider keeping Spanton in place, even though Spanton had chronic difficulties in dealing with the Atlanta DCAA office, if Spanton were on the right track. There is simply no evidence that Starrett had improper motives or that Spanton's whistleblowing, *qua* whistleblowing, entered into his decision not to grant Spanton a waiver to DCAA policy. Spanton's allegations do not satisfy the Board's own "significant factor" standard as enunciated in *Brown, supra.*

In summation, we conclude that Spanton was due to be rotated in accordance with generally applicable DCAA policy. He raised a decision he regarded as unfavorable—the failure to grant a waiver—as itself proof of retaliation. But Starrett would have been remiss in granting the waiver unless satisfied that there were extraordinary circumstances making it desirable to freeze Spanton in his old location despite expiration of the due rotation date, and the agency's general expectation of advantages from transfer. The record is devoid of any such compelling reasons for extraordinary treatment, the ignoring of which by Starrett was responsible for Spanton's rotation.

Spanton has indeed had things the wrong way around. Rotation was mandated absent compelling reasons. He would, in effect, urge that his remaining in place was called for absent compelling reasons, *i.e.,* that he be accorded preferential treatment.

### D. *Fine and Removal of Starrett*

Since we reverse, rendering imposition of any penalty inappropriate, we are not called upon to decide whether dual sanctions, both a) fine and b) removal from the federal service would be appropriate. We simply note that, under 5 U.S.C. § 1207(b),

> A final order of the Board may impose disciplinary action consisting of removal, reduction in grade, debarment from Federal employment for a period not to exceed 5 years, suspension, reprimand, *or* an assessment of a civil penalty not to exceed $1,000.

(Emphasis added). "Or" quite possibly means that the various elements in a series are alternatives. *George Hyman Const. Co. v. Occupational Safety and Health Review Commission,* 582 F.2d 834, 840 n. 10 (4th Cir.1978).

### E. *Disproportionate Penalties*

We also have no reason to reach petitioner's final argument, *i.e.,* that his penalty was disproportionately harsh under the standards of review of administrative actions.

For the foregoing reasons, the decision of the Merit Systems Protection Board is

REVERSED.