

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-8-1995

# Carlisle Area School v. Scott

Precedential or Non-Precedential:

Docket 94-7520

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Carlisle Area School v. Scott" (1995). *1995 Decisions.* Paper 210.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/210

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NOS. 94-7520 and 94-7539
_____

CARLISLE AREA SCHOOL

v.

SCOTT P., BY AND THROUGH HIS GUARDIANS,
BESS P. AND RICHARD E. P.,

Appellant in No. 94-7520

CARLISLE AREA SCHOOL DISTRICT,

Appellant in No. 94-7539

v.

SCOTT P., BY AND THROUGH HIS GUARDIANS,
BESS P. AND RICHARD E. P.

_____

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civ. No. 93-cv-00458)
_____

Argued: March 10, 1995

Before: BECKER, SCIRICA, and WOOD,[0]
Circuit Judges.

(Filed:  August 8, 1995)


DENNIS C. McANDREWS, ESQUIRE (ARGUED)
315 Upper Gulph Road
Wayne, PA  19087

_____

[0]*.  The Honorable Harlington Wood, Jr., United States Circuit
Judge for the Seventh Circuit, sitting by designation.


1

                    Attorney for Scott P., by and through
his
                    Guardian, Bess P. and Richard E. P.


                    FRANK P. CLARK, ESQUIRE (ARGUED)
                    James, Smith & Durkin
                    20 Valley Road
                    P.O. Box 650
                    Hershey, PA  17033

                    Attorney for Carlisle Area School
                    District

_____

OPINION OF THE COURT
_____


BECKER, Circuit Judge.

        This case arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1485 (1990). The underlying administrative proceeding against the Carlisle Area School District was commenced by Scott P., a disabled twenty year old, through his parents, Richard P. and Bess P. on the grounds that the school district had not fulfilled its statutory obligations to Scott under IDEA. The hearing officer at the local educational level granted the relief requested, i.e., residential placement, and six months' compensatory education (to extend beyond Scott's 21st birthday.) An appeals panel at the state education agency level reversed the residential placement order but affirmed the award of compensatory education. The school district appealed this decision to the District Court for the Middle District of Pennsylvania, and the parents cross-

2

appealed. The district court affirmed the decision of the appeals panel. The parents appeal the denial of residential placement. The school district appeals the award of compensatory education.

The appeal presents several questions of special education law of first impression in this Circuit. First, we must address the parents' contention that the administrative and judicial proceedings were procedurally defective because of an alleged violation of IDEA's efficiency-oriented finality requirements stemming from the district court's two remands to the appeals panel for clarification. Although the parents assail the fact that the district court twice remanded the case to the appeals panel, we hold that these remands did not violate IDEA's finality requirements since they advanced rather than impeded the goal of safeguarding access to meaningful judicial review.

Second, the appeal requires us to decide the proper scope of review to be used by a state appeals panel reviewing a local hearing officer's decision, and the proper scope of review by the district court in reviewing a ruling of a state appeals panel. We conclude that the appeals panel's review is plenary except that it is required to defer to the hearing officer's credibility determinations unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion. The district court may reach an independent decision, except that it must accord the decision of the state agency "due weight" in its consideration. In a related vein, we

3

also address the parents' claim that the appeals panel and the district court misallocated the burden of proof on the appropriateness of the proffered Individualized Educational Program ("IEP"). We conclude that, while school districts bear the burden of proving the appropriateness of the educational plans they proffer, they are not required to prove the inappropriateness of any competing plans advocated by parents.

Next, we consider whether the appeals panel applied the correct standard in reviewing the order for residential education. As the district court correctly recognized, IDEA requires a placement calculated to confer only some educational benefit (not an optimal education), and also that the program be delivered in the least restrictive environment. On the developed record, the district court did not err in concluding that residential placement was not proper, and thus it correctly affirmed the appeals panel's reversal of the residential placement order.

Finally, we must determine the appropriate standard for the award of compensatory education and the correctness of the award in this case. Compensatory education effectively extends the disabled student's entitlement to a free appropriate education beyond the normal cutoff point, which occurs when the child reaches age 21. We conclude that the award of compensatory education was improper here because there was no record evidence of any violation during the year purporting to serve as the basis for the award, and certainly no gross or prolonged deprivation,

4

which other courts have required as a precondition to a compensatory education award.

## I. FACTS AND PROCEDURAL HISTORY

Scott P., who was born on February 12, 1973, sustained serious brain injuries resulting in cortical blindness in a 1980 swimming pool accident.[0] Prior to the accident, Scott attended regular kindergarten and first grade, but has been enrolled in various special educational programs since that time.

During the 1991-92 school year, Scott's parents and the school district were unable to agree upon an appropriate educational program for the 1992-93 year. The plan offered by the school district would have enrolled Scott in a physical support class at the Mechanicsburg High School operated by the Capital Area Intermediate Unit ("CAIU"). One other blind student and two students suffering from head trauma were also assigned to this class. Scott's parents contested the appropriateness of this plan because of its resemblance to the 1991-92 IEP, under which they contended Scott had not progressed.

The parents thereupon took Scott to the A.I. duPont Institute, which conducted an evaluation of Scott's needs. The duPont Institute recommended that Scott be placed in an intensive

---

[0] The accident also caused light spastic hemiplegia, irritable bowel syndrome, gastroesophageal reflex, von Willebrandt's disease, temporomandibular joint dysfunction, status post cholecystectomy, status post ventriculoperitoneal shunt, and vocal chord weakness. Additionally, Scott has been susceptible to depression, migraine headaches, recurrent sinus and strep infections, gastrointestinal problems and hepatitis C.

5

residential program at the Maryland School for the Blind ("MSB") so that he could attain greater independence. In light of this recommendation, and given Scott's failure to progress in preceding years, Scott's family and his private evaluator submitted that he needed (and that the IEP should provide) the specialized educational placement for blind students provided at MSB. In September, 1992, Scott's family enrolled him in MSB; they also requested the statutorily-provided due process proceedings in order to contest the educational program the school district had proposed for Scott. At issue was the district's obligation to reimburse Scott's parents for his education at MSB.

Due process hearings were conducted before a state hearing officer, Dr. Joseph French, on December 3, 15, and 17, 1992. Based on documentary evidence and the testimony of various experts and teachers, Dr. French filed a report and order directing the school district to develop an IEP for Scott that would provide academic, social, and vocational instruction with blind peers. The order also specified that such instruction continue beyond normal school hours. The effect of this order was to require that the school district provide (i.e., pay for) residential programming for Scott at the MSB, as neither the District nor the CAIU could accommodate such an IEP in their existing programs. Dr. French also ordered that Scott receive six months of education beyond his 21st birthday to "compensat[e] for the first half of the current [1992-93] school year." Op. at 9 (citations omitted).

6

The school district filed exceptions to Dr. French's decision. On March 3, 1993, a Pennsylvania Special Education Appeals Panel, Anne Hartwig presiding, issued a decision which acknowledged the inadequacy of the 1992-93 IEP, and ordered more instruction with blind peers, but reversed the order of residential placement. Although the panel recited that it had given "due deference" to the hearing officer's findings of fact, it rejected the finding that Scott required programming beyond normal school hours on the grounds that the record evidence taken as a whole did not support the conclusion that Scott required a residential placement in order to provide programming beyond normal school hours. However, the panel affirmed the award of compensatory education.

On April 2, 1993, the school district appealed the decision of the appeals panel by filing a complaint in the District Court for the Middle District of Pennsylvania alleging that "the panel erroneously ordered changes to Scott P.'s Individualized Educational Program that are in conflict with the narrative discussion in the panel's decision." A brief evidentiary hearing was conducted on January 24, 1994, at which the District Court heard additional evidence concerning Scott's program at MSB. On March 30, 1994, the district court, which found the appeals panel decision confusing, ordered that the case be "remanded to the Pennsylvania Special Education Appeals Panel for clarification . . . ."

On April 27, 1994, Hartwig delivered a clarification for the appeals panel. The district court was still dissatisfied

7

with this "clarification," which purported to find the 1992-93 IEP appropriate even though the panel had ordered modifications to the program in its original opinion; moreover, in justifying its award of compensatory education, the panel had declared the 1991-92 IEP inappropriate even though the appropriateness of that program had not been challenged and had not served as the basis of the hearing officer's award. The district court therefore remanded this case to the appeals panel for another clarification. On July 6, 1994, Hartwig issued a second "clarification." The district court, while commenting that the "renderings of the Appeals Panel remain somewhat confusing," stated that it was according the appeals panel's decision "considerable deference" and affirmed its order. The parents appeal the denial of the residential placement; the district appeals the award of compensatory education.

## II. FINALITY

The parents make a claim of procedural defect based on regulations under IDEA which require that the hearing officer issue a final order within 45 days of the parents' request for a hearing and that the appeals panel's decision must be issued within 30 days of the request for an appeal. 20 U.S.C. § 1415(e)(1); 34 C.F.R. §300.512. The parents allege that the district court violated their procedural rights under IDEA by twice remanding the action to the appeals panel for clarification. We disagree.

8

In _Muth v. Central Bucks School District_, 839 F.2d at 124-26 (3d Cir. 1988), _rev'd on other grounds_, 491 U.S. 223, 109 S. Ct. 2397 (1989), we specifically prohibited the use of remands to administrative hearing officers for further proceedings. _Muth_, however, dealt with a remand by the secretary of the state agency to the appeals panel, not a remand by a judge. Moreover, _Muth_ rested on the rationale that remands to the administrative hearing officer obstructed the party's access to judicial review. To prohibit the _court_ from remanding for clarification would impair the court's ability to review the decision fairly and undermine the very policies animating _Muth_. The fact that these particular remands did not aid the court in disposing of this case does not invalidate the remands. Thus, while the statute clearly proscribes remands within the state's administrative system, we see no basis for prohibiting judicial remands.

## III. STANDARD OF REVIEW

### A. Introduction

A good deal of the briefing and argument in this appeal has focused on the standard of review. This attention results from the fact that three applicable levels of review are at issue -- our review of the district court's order; the district court's review of the state appeals panel's decision; and the appeals panel's review of the hearing officer's decision. We, of course, exercise plenary review over the district court's conclusions of law and review its findings of fact for clear error. _Wexler v. Westfield Bd. of Educ._, 784 F.2d 176, 181 (3d Cir.), _cert._

9

denied, 479 U.S. 825, 107 S. Ct. 99 (1986). Because the parents here allege that the district court failed to observe its own proper scope of review, we must determine whether the district court erred in its interpretation or application of the law governing the administrative review process, a question over which we exercise plenary review. Louis W. Epstein Family Partnership v. KMart Corp., 13 F.3d 762, 765-66 (3d Cir. 1994).

The parents' burden of proof and finality arguments also hinge on legal interpretations, and are thus subject to plenary review. Id. We review the district court's determination of the 1992-93 IEP's appropriateness, a factual question, see Association for Community Living v. Romer, 992 F.2d 1040, 1044 (10th Cir. 1993); Hampton School Dist. v. Dobrowolski, 976 F.2d 48, 52 (1st Cir. 1992), under a clearly erroneous standard, Hassine v. Jeffes, 846 F.2d 169, 174 (3d Cir. 1988), while we exercise plenary review over the legal standard relied upon to evaluate the IEP and to approve the award of compensatory education. Wexler, 784 F.2d at 181.

B. Discussion

The parents' threshold argument is that the district court erred when, despite the fact that the state appeals panel did not properly defer to the findings and recommendations of the hearing officer, it affirmed the panel's order. As we have noted, the administrative regime at issue here creates two questions pertaining to the appropriate standard of review. First, we must determine what degree of deference the appeals panel owes the hearing officer. Second, we must decide the

degree of deference owed by a district court reviewing an appeals panel's reversal of the hearing officer, and we must determine whether the appeals panel deserves less deference when it contravenes the hearing officer's factual findings.

1. The Statutory Framework.

IDEA requires that states receiving federal funds for education must provide every disabled child with a "free appropriate public education."  20 U.S.C. § 1412(1) (1990).  The core of this entitlement is provided by the IEP, the package of special educational and related services designed to meet the unique needs of the disabled child.  See Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 173 (3d Cir. 1988), cert. denied, 488 U.S. 1030, 109 S. Ct. 738 (1989). Regulations promulgated under IDEA entitle parents dissatisfied with their child's IEP to "an impartial due process hearing."  20 U.S.C. §1415(b); 34 C.F.R. § 300.506-512.  States may choose either a one-or a two-tier administrative system.  Pennsylvania has a two-tier system in which the initial hearing occurs at the local educational agency level followed by an "independent" review of that hearing at the state educational agency level.  20 U.S.C. § 1415(c) (1990).  Federal regulation § 300.510, promulgated under § 1415(c), provides that an "impartial" officer is to conduct the review and that such officer should make an "independent decision."   See 34 C.F.R. §300.510 (1993).

A party aggrieved by a final order of the state authorities may appeal to federal court.  Section 1415(e) of IDEA

provides that district courts "shall receive the records of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e) (1990). Although this provision could be read to permit the district court to review the evidence de novo, disregarding the findings and rulings of the state agencies, the Supreme Court has required that federal district courts afford "due weight" to state administrative proceedings in evaluating claims under IDEA. See Board of Educ. v. Rowley, 458 U.S. 176, 206, 102 S. Ct. 3034, 3051 (1982). As we explained in Oberti v. Board of Education, 995 F.2d 1204, 1219 (3d Cir. 1993), district courts have discretion to determine how much deference to accord the administrative proceedings, and although the district courts "must consider the administrative findings of fact, [they are] free to accept or reject them." Id. at 1219 (quoting Jefferson County Bd. of Educ. v. Breen, 853 F.2d 853, 857 (11th Cir. 1988)). But if the district court chooses to depart from the agency's ruling, it should provide some explanation for its departure. See Doyle v. Arlington County School Bd., 953 F.2d 100, 105 (4th Cir. 1991).

The ramifications of Rowley's injunction to give "due weight" are unclear where a state creates a two-tiered administrative regime and each tier arrives at a different conclusion. The circuits have split on the question whether federal district courts acting pursuant to Rowley should accord

12

due weight to the trial level hearing officer or to the appeals panel where the two bodies differ and where the appeals panel may not have properly deferred to the hearing officer's findings. In Thomas v. Cincinnati Board of Education, the Court of Appeals for the Sixth Circuit held that the "only logical position" was to defer to the appeals panel, the final decision-maker of the state agency, over the hearing officer. 918 F.2d 618, 624 (6th Cir. 1990). See also Karl v. Board of Education of Geneseo County School Dist., 736 F.2d 873, 877 (2d Cir. 1984) ("We believe Rowley requires that federal courts defer to the final decision of the state authorities, and that deference may not be eschewed merely because a decision is not unanimous or the reviewing authority disagrees with the hearing officer."). In contrast, the Fourth Circuit has held that the district court erred in deferring to a reviewing officer who, reversing the hearing officer, discredited a witness he had not seen or heard testify. See Doyle, 953 F.2d at 100.

At the threshold, we must decide whether the appeals panel failed to defer to the hearing officer, for if we find that the appeals panel adequately deferred to the hearing officer, then the district court plainly complied with Rowley in according "considerable deference" to the appeals panel's decision. Because the provisions of IDEA that accommodate the two-tier due process system do not specify the proper standard, see Perry A. Zirkel, The Standard of Review Applicable to Pennsylvania's Special Education Appeals Panel, 3 WIDENER J. PUBLIC L. 871, 876 (1994), we must first decide what that standard is.

13

### a. Appeals Panel Review of the Hearing Officer's Decision

Section 1415(c) describes the state agency's review as follows: "If the [initial impartial] hearing ... is conducted by a local educational agency ..., any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State Education Agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an <u>independent decision</u> upon completion of such review." 20 U.S.C. §1415(c) (emphasis added). The regulation interpreting this provision further provides that the reviewing officer <u>may</u> "<u>[s]eek additional evidence if necessary</u>," and may "[a]fford the parties an opportunity for oral or written argument, or both, at the discretion of the reviewing official." 34 C.F.R. § 300.510(b)(3)-(4) (1993) (emphasis added). Although this language does not explicitly define the appeals panel's scope of review, it suggests a non-deferential standard.[0] The fact that the statute contemplates that the appeals body will make an "independent decision" suggests not that the appellate body should defer but that it should reach a decision based on its own

---

[0] We need not address the question whether federal law pre-empts state laws which specify the appeals panel's standard of review since the Pennsylvania statute creating the apparatus for the two-tiered due process hearing is silent on this issue. The Pennsylvania statute provides: "The decision of the impartial hearing officer may be appealed to a panel of three appellate hearing officers. The panel's decision may be appealed further to a court of competent jurisdiction. In notifying the parties of its decision, the panel shall indicate the courts to which an appeal may be taken." 22 PA. CODE § 1464(m) (1992). The Pennsylvania courts have not consistently interpreted this statute to impose a definitive standard of review. See Zirkel, 3 WIDENER J. PUBLIC L. at 878-82.

evaluation of the evidence, "independent" of the findings of the hearing officer. The language of the regulation, see 34 C.F.R. § 300.510(b)(3) (1993), bolsters this interpretation, since the receipt of additional evidence necessarily entails the weighing of the new evidence against the evidence presented in the first (administrative) hearing.

As a matter of general appellate principle, however, appeals panels ordinarily defer to the trial presider's factual findings based on credibility judgments about the witnesses presented at the trial or hearing. For example, Rule 52(a) of the Federal Rules of Civil Procedure states: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed. R. Civ. P. 52(a). See also Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985) (requiring even greater deference to the trial court's findings regarding the credibility of witnesses than to the court's other fact findings).[0] But deference to a factfinder's particular credibility judgment does not necessarily result in deference to all of the findings of fact based on that judgment.

While review of credibility-based factual findings is limited, it is not meaningless. "Where . . . the findings . . .

---

[0] Obviously, conclusions of law receive plenary review. See, e.g., Louis W. Epstein Family Partnership v. KMart Corp., 13 F.3d 762, 765-66 (3d Cir. 1994) (applying plenary review to choice, interpretation and application of the law to the historical facts). Moreover, a trial court cannot shield a legal error from review simply by labelling it as a factual finding. Id.

15

are not supported by the record, and indeed, the record supports contrary findings, we must reverse." Ali v. Gibson, 631 F.2d 1126, 1129 (3d Cir. 1980), cert. denied, 449 U.S. 1129 (1981); see also Anderson, 470 U.S. at 575, 105 S.Ct. at 1512 (restricting deference to cases where credibility evidence is not contradicted by "extrinsic evidence"); Cooper v. Tard, 855 F.2d 125, 126 (3d Cir. 1988) (limiting appellate review to an assessment of whether there is enough evidence on the record to support such credibility findings).

We thus embrace the Fourth Circuit's approach in Doyle v. Arlington County School Board, 953 F.2d at 105, to the extent that that decision was premised on this specific principle, that credibility-based findings deserve deference unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion. But beyond this rather narrow class of record-supported, credibility-based factual findings, we think that, to give the statute's language about "independent" decisions effect, the appeals panel must have much more leeway in reviewing other non-credibility based findings of the hearing officer. See Zirkel, 3 WIDENER J. PUBLIC L. at 892. We will therefore defer to the appeals panel rather than the hearing officer in most circumstances, bringing us closer to the approach taken by the Second and Sixth Circuits in Karl v. Board of Education of Geneseo and Thomas v. Cincinnati Board of Education, respectively. See supra at p. 11-12.

16

Our approach is also consistent with administrative law principles, which permit an agency or board freely to accept or reject an ALJ's findings and conclusions of law. Section 557(b) of the Administrative Procedures Act (APA) provides: "On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule."  5 U.S.C. § 557(b) (1995). Courts review the board's decisions, not those of the ALJ's. Starrett v. Special Counsel, 792 F.2d 1246, 1252 (4th Cir. 1986) (citing 3 K. Davis Administrative Law Treatise, § 17.16 (2d ed. 1980)).

Moreover, limiting the appeals panel's deference to those situations involving record-supported credibility determinations tracks the approach taken by other administrative regimes, such as that created by the National Labor Relations Act. 29 U.S.C. § 151 et seq. (1973 and Supp. 1995); see Stein Seal Co. v. NLRB, 605 F.2d 703 (3d Cir. 1979) (holding that the Board was free to make fact findings contrary to the ALJ's so long as they are supported by substantial evidence); Local 259, United Auto., Aerospace and Agr. Implement Workers v. NLRB, 776 F.2d 23 (2d Cir. 1985) (upholding the decision of the Board where differences between ALJ and the board did not result from divergence of views as to credibility of testimony concerning evidentiary facts but instead resulted from differences in overall judgment as to proper inferences and ultimate determination).

17

We thus hold that appeals panels reviewing the fact findings of hearing officers in two-tier schemes (such as Pennsylvania's) exercise plenary review, except that they should defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion.

b. <u>District Court Review of the Appeals Panel</u>

As we noted, <u>see</u> <u>supra</u> at 11, IDEA empowers the district court to hear additional evidence, and directs the court to base its decision on the preponderance of the evidence. We have interpreted <u>Rowley</u>'s mandate to accord "due weight" to the administrative proceedings as a requirement to consider -- although not necessarily to accept -- the administrative fact findings. <u>Oberti</u>, 995 F.2d at 1219. The precise question here is whether the district court owes less consideration to the administrative fact findings when the second tier reversed the first tier. Clearly, the district court's review should be unaffected where the appeals panel owes no deference to the hearing officer. Thus, the issue is whether the district court's review should be any less deferential where the appeals panel disregarded a record-supported, credibility-based factual determination of the hearing officer.

Given our decision about the appeals panel's scope of review, we conclude that a district court should still give "due weight" to the appeals panel's decision when it reverses the hearing officer's conclusions of law, inferences from proven

18

facts, and factual findings based on credibility judgments where non-testimonial, extrinsic evidence justified the appeals panel's contrary decision.[0]   In this case, because the appeals panel

[0] We assume without deciding that, under IDEA, a district court should accord somewhat less consideration to an appeals panel ruling that disregards a hearing officer's credibility judgments where this standard is not met.  We base this assumption on the standards applicable in other statutory regimes that also involve a two-level administrative proceeding.  See Chen v. General Accounting Office, 821 F.2d 732 (D.C. Cir. 1987) (requiring administrative board to accord great deference to those findings of original decision maker that turned on credibility judgments); Brock v. L.E. Myers Co., High Voltage Div., 818 F.2d 1270 (6th Cir. 1987) (requiring Occupational Safety and Health Review Commission to articulate reasons for failing to credit findings of an ALJ who had a unique opportunity to observe demeanor of witnesses); Citizens St. Bank v. Federal Deposit Ins. Corp., 718 F.2d 1440 (8th Cir. 1983) (scrutinizing agency's decision where agency departed from ALJ's finding without reflecting attentive consideration to ALJ's decision); Haberson v. NLRB, 810 F.2d 977 (10th Cir. 1987) (requiring NLRB to accord ALJ findings due weight although board is not bound by ALJ findings).  Cf. Stein Seal Co. v. NLRB, 605 F.2d 703 (3d Cir. 1979) (regarding the ALJ's findings as "merely advisory" where the Board's contrary findings are supported by substantial evidence).  But see Starrett v. Special Counsel, 792 F.2d 1246 (4th Cir. 1986) (allowing Merit Systems Protection Board to accept or reject ALJ's findings and conclusions of law).  The National Labor Relations Act caselaw specifically addressing the issue of judicial review of administrative appeals also suggests that, although district courts should normally defer to the Board's decisions, the courts should be less deferential where the Board reached a decision contrary to the ALJ's.  See GSX Corp. of Missouri v. NLRB, 918 F.2d 1351 (8th Cir. 1990) (reviewing board's findings more critically where board's findings are contrary to ALJ's); C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB, 921 F.2d 350 (1st Cir. 1990) (applying "slightly" less deferential standard to the board where it reaches a conclusion opposite to the ALJ); Centre Property Management v. NLRB, 807 F.2d 1264 (5th Cir. 1987) (applying "more searching" scrutiny to board's findings where they conflict with ALJ's); NLRB v. Cooper Union for Advancement of Science and Art, 783 F.2d 29 (2d Cir. 1986) (applying higher scrutiny to board findings that differ from ALJ's but only where differences concern evidence that turns on credibility).  But see Glaziers Local Union 558 v. NLRB, 787 F.2d 1406 (10th Cir. 1986) (applying the same standard to the board whether or not it reached conclusions contrary to the ALJ).

found that the extrinsic evidence in the record supported conclusions contrary to those of the hearing officer, the district court correctly gave the panel's decision "due weight" notwithstanding the panel's differences with the hearing officer.

## 2. The Nature of the Disputed Rulings.

We turn to the nature of the disputed rulings, for application of the standard of review turns thereon. While this discussion will propel us to some degree into a discussion of the merits, treated infra, that cannot be avoided. Although Scott's parents understandably want this court to view the contested portions of the hearing officer's ruling as record-supported credibility judgments that would be shielded from appeals panel review, they are in reality credibility findings that are contradicted by not insubstantial record evidence. With respect to the appeals panel's finding that the 1992-93 IEP was appropriate, the parents claim that the appeals panel "effectively overturned the critical finding by the Hearing Officer that 'for the last few years [Scott's] academic achievement, as determined by his teacher, has been (only) maintained and when measured by standardized tests has continued to be at the fourth to fifth grade level.'" The record, however, contained ample evidence that Scott had made progress. When measured by teacher-constructed exams, Scott's academic

---

Because the disputed portions of the hearing officer's opinion did not find support in the non-testimonial, extrinsic evidence in the record, however, they were not entitled to deference by the appeals panel, and we need not decide this issue.

20

achievement had improved. HO Op. at 4.  The record also notes that Scott had made progress in reading and writing braille. Id.

In any event, appropriateness is judged prospectively so that any lack of progress under a particular IEP, assuming arguendo that there was no progress, does not render that IEP inappropriate. See infra at 30-32.  However, even if the observation about progress under the 1991-92 IEP did reflect on the legal appropriateness of the 1992-93 IEP, it could not, standing alone, support the hearing officer's conclusions about the 1992-93 IEP: additional inferences and conclusions would have to be drawn.  For example, one would have to assume that Scott's needs had remained completely unchanged between the years, and that one could attribute Scott's lack of progress during 1992-93, for example, to the failure of the 1992-93 program to provide a service for a need that had manifested itself during the 1991-92 year (prior to the development of the relevant IEP).

Consequently, the appeals panel would not have needed to set aside Dr. French's "findings" about the credibility of the teacher and the mobility specialist who testified that they had seen no progress in recent years to find that the 1992-93 IEP was appropriate.  Rather, the appeals panel could have credited their statements and nevertheless found that the 1992-93 plan passed muster because of the additions to the 1992-93 program[0] or

_____

[0]The plaintiffs' argument that the compensatory education award mandates residential placement depends on the identity of the 1991-92 IEP with the 1992-93 IEP, but there are some important differences.  The 1992-93 plan provides for psychological counseling with blind youths, OT/PT monitoring, and transition planning, three "related services" not supplied in the earlier

because of changes in Scott's needs. Alternatively, the appeals panel could have concluded that the non-testimonial, extrinsic evidence in the record evidence did not support the findings.

While either of these approaches could independently justify the appeals panel in making a finding different from the hearing officer, the appeals panel invoked both bases in this case. The panel carefully distinguished the content of the 1992-93 IEP from that of the 1991-92 IEP (see 4/27/94 Order at 2), thus breaking the link between progress made under prior IEPs and the appropriateness of the 1992-93 IEP. The panel also evidenced its searching review of all the record evidence when it stated that "there was sufficient evidence in the record so as to allow the officer to find that the District had attempted to provide Scott with an [appropriate] IEP . . . ." (4/27/94 Order at 2.)

At all events, the core issue in this case pertains to the state appeals panel's reversal of the hearing officer's award of residential education at the MSB. The parents contend that the appeals panel "simply rejected Dr. French's critical factual findings that 'in addition to regular therapy, Scott needs help from peers with similar problems . . . . He needs programming beyond typical school hours to have sufficient intensity to make additional gains.'" But here too, the appeals panel did not

_____

plan. The 1992-93 IEP also contains a much more detailed set of goals/predictions in the "Content" section, and a much more specific list of "Specially Designed Instruction." Additionally, the later program reflected more ambitious "Expected Post-School Outcomes," listing, for example, supported employment or sheltered employment where the earlier plan had only stated "will explore more specific evaluations." Compare generally, 1992-93 IEP, 582-596a, with 1991-92 IEP, 702a-710a.

22

simply reject the testimony relied on by the hearing officer so much as find that the record did not support the officer's conclusion. In particular, the hearing officer relied on testimony that Scott needed his school instruction to be reinforced by other activities to find that these reinforcing activities needed to occur "during other hours of his day," a phrase he took to require residential placement. The appeals panel believed, however, "that there was insufficient evidence in the record" to support the conclusion that those reinforcing activities had to occur "during other hours of his day." 4/27/94 Order at 3.

The appeals panel's rejection of the residential placement also resulted from its doubts about the attribution of Scott's failure to accept his blindness (and its effects on his progress) to the deficiency of peer contact afforded by the school district's IEP. See 3/3/93 Order at 4 n.13 ("The record seems to indicate that this inability or unwillingness by Scott to accept his handicap may account for his apparent lack of progress as anticipated by his teachers and parents. The issue, however, is whether more contact with blind peers is the remedy or whether increased skills will help Scott accept his handicap.")

Had the appeals panel found that Scott did not need any peer contact and/or that he did not require any additional programming, the appeals panel would have been rejecting well-supported testimony credited by the hearing officer. But the record evidence did not unequivocally support the hearing

23

officer's findings with respect to progress under prior IEP's, off-hour programming, or the need for more peer contact. Because the record evidence did not support the findings, this is simply not a case where the panel encroached on the credibility judgments of the hearing officer, for we agree with the appeals panel that "the reasons why Scott has not made the anticipated progress in his educational placement remain unclear." More specifically, it appears that Scott was not attending school for the full day and missed certain extended periods due to various illnesses.

Both the appeals panel and the hearing officer felt that full implementation of the school district's IEP was impeded by those factors. See 3/27/94 Order at 2 ("The panel agreed with the Hearing Officer that a significant difficulty in evaluating the appropriateness of the proposed '92 IEP was Scott's failure to attend his school program for a full day. The officer speculated, if Scott did not go home at 1 p.m., he could have training in daily living skills provided at the school."); HO Op. at 4. As a consequence, the testimony that Scott needed more programming, even if credited, does not compel residential placement, especially in light of the 1992-93 IEP's proposal to provide "full day" programming.

Neither does Scott's need for peer contact necessarily require residential placement, since the appeals panel found that
> there was sufficient evidence in the record
> so as to allow the officer to find that the
> District had attempted to provide Scott with
> an IEP that would permit him an opportunity
> to interact with peers. While the

24

> opportunity to interact, as provided by the
> District, may not be [sic] have been ideal or
> optimal, nevertheless, the panel concluded
> that the District had acted in a manner that
> would have allowed Scott to reasonably
> benefit from his placement, in this context
> of interaction with peers.

4/27/94 Order at 2-3. Aside from the fact that evidence supporting the need for more peer contact was contradicted, to give such testimony dispositive effect would run afoul of at least two legal propositions under IDEA (discussed below): that the district need not provide the optimal IEP, and that the program be provided in the least restrictive educational environment appropriate to the needs of the child. 20 U.S.C. § 1412(5)(B) (1990).

The panel correctly stated the law when it wrote: "The Hearing Officer's conclusion that Scott must then be entitled to a residential placement is incorrect. The standard to be applied in determining the least restrictive alternative is not to find an optimum placement for Scott but rather to decide whether an appropriate educational placement can be achieved in a non-restrictive setting." See 3/3/93 Op. at 5. Under the appropriate legal framework, therefore, even uncontroverted testimony that many more hours of programming or that contact with many peers would benefit Scott would not support the adoption of a more restrictive residential placement. Moreover, even if the appeals panel had reversed findings based on uncontradicted testimony, it would not necessarily change the result in this case. In light of Oberti, 995 F.2d 1204 (3d Cir. 1993), after considering the administrative findings of fact, the

25

district court was free to reach a different conclusion from its independent review of the record.

Thus, the district court could effectively affirm the panel by independently finding its own facts contrary to those found by the hearing officer. Because we are confident that the district court did independently consider the record, we believe that it could affirm the appeals panel decision even if the appeals panel had acted improperly in reversing the hearing officer's findings.[0] The same arguments refute the parents' contention that the district court erred when it affirmed an appeals panel ruling it conceded to be "somewhat confusing." The district court could effectively affirm the panel, despite its inability to precisely discern the panel's ratio decidendi, by making rulings based on its independent review of the record and the preponderance of evidence.

## 3. Conclusion

Because the contested "findings" of Dr. French (i.e., those over which the appeals panel and Dr. French disagree) do not find unmixed record support, we conclude that the district court correctly accorded the appeals panel "substantial consideration," notwithstanding the fact that the panel did not adopt the hearing officer's credibility-based recommendations. Moreover, to the extent that the hearing officer's recommendations offended other provisions of IDEA, they rested on

---

[0]Although the district court did accord the decision of the Appeals Panel "considerable deference," its opinion also evidences an independent review of the record. See Dist. Ct. Op. at 7, 11.

26

an error of law over which the appeals panel exercised plenary review. Thus, we need not address the question whether the "consideration" the district court afforded the appeals panel would have been appropriate if the panel had in fact encroached on the limited terrain of credibility judgments falling within the primary purview of the hearing officer.

IV. BURDEN OF PROOF

The parents make an interesting argument that the appeals panel erroneously placed the burden of proving the inappropriateness of the 1992-93 IEP on them. Although they fail to identify any specific element(s) of the IEP on which the school district failed to demonstrate appropriateness, the parents rely on the panel's reversal of the order of residential placement as proof that the burden had been improperly shifted. Contending that the MSB provided better-- and to them the only adequate--opportunities for contact with blind peers and for expanded programming, they reason that it is also the district's burden to prove the _in_appropriateness of any other IEP they might advocate. We disagree.

In administrative and judicial proceedings, the school district bears the burden of proving the appropriateness of the IEP it has proposed. Oberti, 995 F.2d at 1219; Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1035 (3d Cir. 1993) ("[T]he burden of showing that the placement is 'appropriate' rests with the school district."). But that does not mean that the school district also bears the burden of proving the _in_appropriateness

27

of _any_ alternative IEP that a student's parents might suggest. Such a requirement would not only impose a very substantial burden on the district, but it would also conflict with _Rowley_ and its progeny to the extent that such a general rule would effectively necessitate proof that a district's IEPs were the best rather than simply proof that they conferred some educational benefit.

IDEA's requirement that the placement involve the least restrictive educational environment, 20 U.S.C. § 1412(5)(B), further erodes the parent's arguments about the burden of proof. In _Oberti_, the school district bore the burden of proving appropriateness when it advocated a more restrictive placement, and its teachings are instructive on the question whether it is the proponent or the school district who bears the burden of proving the necessity for a more restrictive placement. In _Oberti_, we recognized "a strong presumption in favor of mainstreaming", 995 F.2d at 1214, and explained that this presumption "would be turned on its head if parents had to prove that their child was worthy of being included, rather than the school district having to justify a decision to exclude the child from the regular classroom." _Id_. at 1219.

These principles are comparably valid here where the parents seek a more restrictive environment. It simply cannot be, in light of the clear congressional preference for inclusion, _id_. at 1214, that the district bears the burden of proving the superiority (not mere appropriateness) of the district's proffered less restrictive setting. We therefore will not

28

require the district to prove the inappropriateness of the more restrictive MSB placement.

## V. RESIDENTIAL PLACEMENT

The parents argue that the court erred by finding that the 1992-93 IEP was appropriate when that plan so closely resembled the 1991-92 IEP which, they assert, the court implicitly impugned by affirming the appeals panel's award of compensatory education. In addition, the parents contend that the fact that the appeals panel ordered modifications to the 1992-93 IEP (in its first 3/3/92 order) must mean that the panel regarded the 1992-93 IEP to be inappropriate. Specifically at issue is the appeals panel's reversal of that portion of the hearing officer's order, premised on the alleged inappropriateness of the 1992-93 plan, which effectively required residential education at MSB.

The principal question, however, even assuming the 1992-93 IEP was somehow inappropriate, is whether an award of residential education was the proper response. The statutory framework imposes dual requirements on school districts. On the one hand, IDEA requires only that school districts provide an "appropriate" IEP, gauged by whether the IEP is "sufficient to confer some educational benefit." Rowley, 458 U.S. at 200, 102 S. Ct. at 3048. Districts need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a "basic floor of opportunity." Id. at 201, 102 S. Ct. at 3048. See also Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1037, 1040 (3d Cir.

29

1993); Kerkam v. Superintendent D.C. Public Schools, 931 F.2d 84, 88 (D.C. Cir. 1991) (refusing to test appropriateness by comparing disputed IEP with proffered alternatives). Moreover, IDEA also commands the school district officials to construct a program in the least restrictive educational environment appropriate to the needs of the child. See 20 U.S.C. § 1412(5)(B) (1990). Residential placement is, by its nature, considerably more restrictive than local extended day programming. See Kerkam, 931 F.2d at 87; G.D. v. Westmoreland School Dist., 930 F.2d 942, 948 (1st Cir. 1991); Roland M. v. Concord School Comm., 910 F.2d 983, 992-93 (1st Cir. 1990).

In our view, the district court did not err in concluding that the 1992-93 IEP was appropriate in the legally relevant sense because that program was calculated to confer some educational benefit on Scott. Although the parents' brief is not entirely clear on this point, its attack on the appropriateness of the 1992-93 IEP appears principally to rely on that plan's alleged similarity to the 1991-92 IEP, rather than make a more direct challenge to appropriateness by identifying particular needs not addressed by the 1992-93 program. This reliance is misplaced, for the alleged similarity of the 1991-92 and the 1992-93 IEP's does not mandate the conclusion that a decision ordering compensatory education is somehow irreconcilable with the refusal to order residential placement. As we explained in Fuhrmann v. East Hanover Board of Education, 993 F.2d 1031, 1040 (3d Cir. 1993), "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not

at some later date. . . . Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." See also Roland M. v. Concord School Comm., 910 F.2d 983 (1st Cir. 1992). Consequently, Scott's failure to make progress in the 1991-92 IEP, a judgment made retrospectively, does not render either the 1991-92 IEP or the 1992-93 IEP inappropriate. Of course, if a student had failed to make any progress under an IEP in one year, we would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate.

Moreover, the parents gloss over the many assumptions needed to equate the 1991-92 IEP that the appeals panel had found inappropriate with the status of the 1992-93 IEP. In particular, the parents believe that the two IEP's are virtually identical although they themselves concede that the 1992-93 IEP included additional goals and objectives and an arrangement for psychological counseling. (appellant's brief at 10). See also supra note 5. The parents apparently assume that these are merely formal additions, but that is not so. An IEP is a written document containing a statement of current educational status, annual goals, short term objectives, a description of the type of program and reasons for its selection, projected dates for initiation and duration, and some objective criteria by which instructional objectives can be evaluated. 34 C.F.R. § 300.346 (1993). The differences between the 1992-93 IEP and the 1991-92 IEP are not merely formal; they reflect the very essence of an

31

IEP. As we have explained, the statute requires that school districts prepare the IEP's based on the student's needs; so long as the IEP responds to the needs, its ultimate success or failure cannot retroactively render it inappropriate.

Importantly, the objectives and services added to the 1992-93 IEP address some of the bases the parents have used to argue for the residential placement. For instance, the district proposed group counseling for blind youths, responding to Scott's need for more contact with blind peers. The plan also responded to the need for extended hour services by providing orientation and mobility training to Scott and his family in their home, presumably during non-school hours. (Appellee's brief, n.3). And despite the parents' insistence that only the MSB can adequately educate Scott, the district's IEP addresses each of the program needs identified by the MSB diagnostic team. (Appellee's brief at 24-27). Based on this similarity to the MSB plan, the one endorsed by the parents, a correct application of the prospective appropriateness inquiry supports the district court's conclusion that the 1992-93 program was appropriate.

The parents, however, contend that only the residential placement recommended by their experts could provide Scott with the requisite "intensity" of services needed for him to make any progress. We think this argument turns on the alleged superiority of the MSB program rather than the inappropriateness of the district's 1992-93 IEP. We do not denigrate the quality of the program available at the MSB and acknowledge that Scott might have benefited more from being in it. Nor can we doubt the

32

parents' best intentions in attempting to seek the optimal placement for their son.  But we must agree with the district court and the appeals panel in holding that program optimality is not the standard.  See 3/3/92 Order at 4; Dist. Ct. Op. at 7. Rowley and Furhmann clearly hold that a program is appropriate if it confers some educational benefit; it does not need to be superior to the alternatives.  See Rowley, 458 U.S. at 200, 102 S. Ct. at 3048; Fuhrmann, 993 F.2d at 1037.  Even assuming that "intensity" was required to confer some benefit, the district's IEP still satisfies Rowley's appropriateness test.  While the district concededly did not propose full day programming for Scott, it did offer programming that could have been more "intense" than what Scott had actually been experiencing.  Due to illnesses and an evaluation at another facility, however, Scott apparently missed a substantial number of days during the 1991-92 school year, and his fatigue apparently caused his parents to insist that Scott end his school day at 1 pm, a full hour and a half early.

In sum, even if it was not optimal, the 1992-93 IEP was calculated to confer educational benefit.  IDEA does not require more.  In fact, on this record, the district court would have erred if it had ordered the allegedly "better" residential placement since such an order would have violated other provisions of IDEA for, as we have explained, an IEP must not only be designed to confer some educational benefit, but it also must deliver the programming in the least restrictive educational environment.  See 20 U.S.C. § 1412(5)(B) (1990).  Even if the

33

1992-93 IEP was not as responsive to the expert's recommendations as the parents might like, the court's authority to order the residential education (which may indeed provide Scott with "better" services) is limited by this command.

Residential placement at MSB is not, of course, the least restrictive educational environment. The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled. See 20 U.S.C. § 1412(5)(B) (requiring maximal educational integration of disabled children with children who are not disabled, and restricting separate schooling to situations when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily); 34 C.F.R. § 300.552; see also Oberti, 995 F.2d at 1214-16; Cordero v. Pennsylvania Dep't of Educ., 795 F.Supp. 1352 (M.D. Pa. 1992).

One of the expressed justifications for the MSB placement was to maximize Scott's contact with disabled peers. This approach, while conferring benefits in some spheres, necessarily minimizes Scott's contact with children without disabilities, and thus directly conflicts with the statute's objective of inclusion. In a similar factual scenario, the D.C. Circuit reversed a district court's order of residential education for a child who also could have benefitted from "an integrated opportunity for daily living skill reinforcement,

34

recreation, and peer interaction after the six-hour school day."

Kerkam v. Superintendent D.C. Public Schools, 931 F.2d at 86. In

Kerkam, the court explained:

> The decision [to order residential education over day placement at a district school] turned on [the court's] understandable concern for Alexander's best interests rather than on the appropriateness of the educational program . . . . There seems to be little doubt that Alexander would have made less progress under the [district's] program, but Rowley precludes our taking that factor into account so long as the public school alternative confers some educational benefit.

Id. at 87 (citation omitted).

This case presents the same situation. Placement at the MSB was not required under Rowley, and it conflicts with the statute. Accordingly, because the order of the district court affirming the Appeals Panel gave "due weight" to its rulings as we have explained that concept and because it otherwise properly comports with both the appropriateness and the least restrictive environment requirements, it must be affirmed.[0]

---

[0]We do not reach this result without misgivings. We are acutely sensitive to the factors that so strongly motivated the hearing officer and so seriously trouble Scott's parents, namely the need for Scott to associate with similarly handicapped peers who are succeeding and who might therefore serve as role models and give him confidence that he too can succeed. We acknowledge the importance of this approach (and this goal). A placement at the MSB would apparently satisfy this need but would be attended by certain disadvantages, such as the lack of contact with non-handicapped peers, which IDEA elevates to legal relevance. We therefore emphasize the need for public school officials to devise means to reconcile these conflicting but compelling interests.

35

## VI.  COMPENSATORY EDUCATION

On cross-appeal, the school district contests the hearing officer's award of six months of compensatory education to remedy its alleged failure to provide Scott with an appropriate program during the 1991-92 year.  Both the panel and the district court affirmed this award.  For several independently sufficient reasons, we reverse the order of compensatory education.[0]

IDEA requires school districts to provide disabled children with free, appropriate education until they reach the age of twenty-one.  See 20 U.S.C. § 1412(2)(B) (1990).  An award of compensatory education extends the disabled student's entitlement to the free appropriate education beyond age twenty-one to compensate for deprivations of that right before the student turned twenty-one.  In Lester H. v. Gilhool, 916 F.2d 865, 872 (3d Cir. 1990), cert. denied, 499 U.S. 923, 111 S. Ct. 1317 (1991), we recognized that adults (i.e., individuals over twenty-one) have a remedy for deprivations of their right to a

_____

[0]At the threshold, we note that this argument may have been waived.  The parents apparently did not contest the appropriateness of the 1991-92 IEP at the time it was offered.  Indeed, they seemed to invoke the alleged inappropriateness of the 1991-92 IEP only to help them prove that the 1992-93 IEP, which they argued was nearly identical, was inappropriate.  Because appropriateness is judged prospectively, see Furhmann, 993 F.2d at 1040, and discussion supra at 30-32, we have declined the parents' invitation to play "Monday morning quarterback" by judging the 1991-92 IEP in hindsight.  Although we do not construe the parents' failure to press their objections to the IEP when it was offered as a waiver, it casts significant doubt on their contention that the IEP was legally inappropriate since it suggests that the parents were also unaware prospectively that the 1991-92 IEP was unlikely to confer educational benefit.

free appropriate education during the period before they reached age twenty-one. We held that Congress intended compensatory education to be available to remedy the deprivation of the right to a free appropriate education. Id. at 872-73 (citing Miener v. State of Missouri, 800 F.2d 749 (8th Cir. 1986)); 20 U.S.C. § 1415 (authorizing courts to award relief they deem appropriate). Because the Supreme Court has held that tuition reimbursement is an appropriate remedy under the EHA (IDEA's predecessor), School Committee of Burlington v. Department of Education, 471 U.S. 359, 370-71, 105 S. Ct. 1996, 2003 (1985), and because a student's access to a remedy should not depend on the parents' ability to "front" the costs of the education and sue for reimbursement, see Miener, 800 F.2d at 753, courts can, under appropriate circumstances, order districts to provide free appropriate education after the student reaches twenty-one.

We have held that compensatory education is available to respond to situations where a school district flagrantly fails to comply with the requirements of IDEA. See Lester H., 916 F.2d 865. See also Burlington v. Department of Educ., 736 F.2d 773, 801 (1st Cir. 1984), aff'd, 471 U.S. 359, 105 S. Ct. 2003 (1985) (upholding reimbursement as equitable remedy available where rights are violated). Although we do not believe that bad faith is required, most of the cases awarding compensatory education involved quite egregious circumstances. This case does not appear to be in that category. For instance, in Lester H., we awarded compensatory education where a district took 30 months after admitting that the in-district placement was inappropriate

37

to locate an appropriate placement despite the availability of at least six suitable schools within the state. See Lester H., 916 F.2d at 870, 873. In addition to implicating much more culpable conduct, Lester H. also explicitly reserved the question whether a court could order compensatory education for periods when a district attempts in good faith to develop an appropriate placement. Lester H., 916 F.2d at 873 n.12.

The cases from other circuits which recognize compensatory education without explicitly requiring a higher degree of intent by the district have also involved more culpable conduct. See Burr v. Ambach, 863 F.2d 1071, 1073 (2d Cir. 1988) (awarding compensatory education where state institution disqualified a student because of its purported inability to accommodate his multiple handicaps without mentioning or considering placement in an extant special program for multiple handicapped students); Jefferson County Bd. of Educ. v. Breen, 853 F.2d 854, 857-58 (11th Cir. 1988) (awarding compensatory education to deter states from unnecessarily prolonging litigation); Miener v. State of Mo., 800 F.2d 749 (8th Cir. 1986) (reversing denial of compensatory education for a child who spent three years in mental health ward of a state hospital after district failed to provide any educational services notwithstanding its own evaluation recommending such services). At least one other circuit has explicitly made a "gross" violation of IDEA a prerequisite to an award of compensatory education. See Garro v. State of Conn., 23 F.3d 734 (2d Cir. 1994); Mrs. C. v. Wheaton, 916 F.2d 69, 75 (2d Cir. 1990)

38

(requiring a gross violation and defining such as instances of undue delay in holding hearings or taking advantage of mental infirmity to deny a placement).

We find the Second Circuit's approach generally persuasive. Although generally speaking we believe that a plaintiff seeking compensatory education must prove a gross or prolonged deprivation of the right to a free appropriate education, the facts of this case patently do not approach this situation, and we therefore need not precisely define the standard. Two things are clear, however. First, it is necessary, but not sufficient, to demonstrate that some IEP was actually inappropriate. Second, bad faith is not required.

In this case, there can be no award of compensatory education because the record does not contain any evidence pertaining to the inappropriateness of the 1991–92 IEP, the program serving as the basis for the award. The only evidence bears on Scott's lack of progress. But as we have explained, appropriateness involves only a prospective evaluation of the IEP, not an after-the-fact measurement of the student's success under the plan.

Even if there were some record on the appropriateness of the 1991–92 IEP, the compensatory education award would still be erroneous since there is simply no indication of any gross or prolonged deprivation by the district. The district's ignorance of the parent's dissatisfaction with the 1991–92 IEP (due to their failure to contest that program) precludes a finding that

39

any deprivation was flagrantly prolonged.[0] Since the record does not reflect the district's awareness of the inappropriateness of the 1991–92 IEP, this case is unlike Lester H. And once the district was apprised of the arguable inappropriateness of the 1992–93 plan, it did not delay in seeking to resolve the dispute. Thus, under the circumstances of this case, it simply cannot be said that the district deprived Scott of an appropriate placement, delayed for any inordinate period of time in addressing any disputes over the program, or in any other way grossly disregarded its obligation to provide Scott with an appropriate educational program.

In any event, there was no violation shown here, since the 1991–92 IEP was not challenged and was therefore presumptively appropriate. We must therefore reverse the district court's order insofar as it awarded six months of compensatory education for the purported inappropriateness of the 1991–92 IEP.

## VII. CONCLUSION

For the foregoing reasons, we will affirm the order of the district court insofar as it upheld the denial of the

---

[0]Although the fact that the appropriateness of the 1991–92 IEP was not properly challenged renders any further analysis of the school district's culpability unnecessary, we note that the district court appeared to misapprehend the standard. The district court seemed satisfied that the parents' challenge to the 1992–93 IEP made the school district aware of the alleged deprivation occurring during 1991–92. We emphasize, however, that the 1991–92 IEP would have to have been contested at the proper time before a court even considers whether the district's failure to remedy the allegedly inappropriate IEP was prolonged.

residential placement, but we will reverse the order insofar as it upheld the award of compensatory education.